**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **SISTEMAS AUTOMOTRICES DE MEXICO, S.A. DE C.V.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **No. 14 C 5289** |
| ) | |
| **MERITOR HEAVY VEHICLE SYSTEMS, LLC,** ) | **Judge Rebecca R. Pallmeyer** |
| ) | |
| **Defendant.** ) | |
| ) | |
| **MERITOR HEAVY VEHICLE SYSTEMS, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **No. 14 C 5319** |
| ) | |
| **QUIMMCO S.A. DE C.V. and SISTEMAS AUTOMOTRICES DE MEXICO, S.A., DE C.V.,** ) | **Judge Rebecca R. Pallmeyer** |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

This case involves a dispute regarding the interpretation of certain joint venture agreements. Meritor Heavy Vehicle Systems, LLC ("Meritor") is a United States–based limited liability company that supplies axles, brakes, and related Components for medium- and heavy-duty trucks, trailers, and other commercial vehicles. Quimmco S.A. de C.V. ("Quimmco") is a Mexico-based manufacturing group. In 2002, the two companies formed Sistemas Automotrices de Mexico, S.A. de C.V. ("SISAMEX"), a Mexico-based joint venture, and the parties executed a Shareholders Agreement and three Supply Agreements that would govern the relationships among Meritor, Quimmco, and SISAMEX. Pursuant to those agreements, SISAMEX manufactures certain Meritor products and supplies them to Meritor for resale to original equipment manufacturers ("OEMs") (that is, the manufacturers who assemble the

vehicles), and Meritor supplies SISAMEX with certain necessary Components for manufacture of Meritor products. Although the parties had a successful working relationship for ten years, they have been at odds since 2013 regarding the meaning of certain provisions in their joint venture agreements. Specifically, Meritor denies that SISAMEX has the right to decide, unilaterally, to manufacture certain Components of the Meritor products it sells to Meritor; SISAMEX and Quimmco contend that that one of the Supply Agreements does grant SISAMEX that right. The parties also disagree about whether Meritor has an obligation to provide technical assistance to SISAMEX for the manufacturing of Meritor products.

Since the formation of the joint venture, one significant development has been the migration to Mexico of OEMs hoping to capitalize on opportunities created by the North American Free Trade Agreement ("NAFTA"). Because the joint venture agreements provide that SISAMEX is Meritor's exclusive supplier for products sold to OEMs in Mexico, the OEMs' Mexican migration is undoubtedly a welcome development for SISAMEX. At its core, the central dispute between the parties is about how much SISAMEX stands to benefit from that migration at the expense of Meritor. If Meritor holds the right to manufacture certain components of Meritor products sold to OEMs in Mexico, it will continue to receive considerable manufacturing margins for the sale of such products. But if SISAMEX has the right to "insource" those components—that is, to manufacture them itself—the manufacturing returns on those sales would go to SISAMEX instead and would thus be shared between Quimmco and Meritor as SISAMEX's shareholders.

SISAMEX brought suit against Meritor in July 2014 seeking a declaration that (1) SISAMEX has the exclusive right to manufacture Meritor products and their component parts, (2) SISAMEX has the right to source materials from third parties without Meritor's prior approval, and (3) Meritor has a duty to provide free technical assistance to SISAMEX for the production of Meritor products. SISAMEX's initial complaint also sought damages for breach of contract and breach of certain implied warranties. Days after SISAMEX filed its complaint, Meritor brought a

parallel action against SISAMEX and Quimmco seeking declaratory relief and damages for breach of contract. In addition to addressing issues raised in SISAMEX's complaint, Meritor's complaint alleges that SISAMEX has an obligation to purchase from Meritor certain so-called "Core Components" of Meritor products.[1]

Both SISAMEX and Meritor filed motions to dismiss the complaints against them. In January 2015, the court granted Meritor's motion to dismiss with respect to SISAMEX's claim for a declaratory judgment that SISAMEX could source materials from third-party vendors without Meritor's approval. The court concluded that the plain terms of two of the Supply Agreements made clear that Meritor's pre-approval is required. Regarding the other counts in the two complaints, however, the court determined that the relevant contractual provisions were ambiguous and could not be interpreted without the aid of extrinsic evidence. Thus the court denied the motions to dismiss with respect to those counts. Following the court's ruling on the motion to dismiss, SISAMEX amended its complaint, paring its asserted claims for relief down to three counts: two counts seeking a declaratory judgment about the parties' respective rights under the agreements and one count alleging breach of contract.

After months of discovery, SISAMEX has moved for partial summary judgment [228] ([191] in Case No. 14 C 5319) on all counts in its amended complaint and in Meritor's complaint. SISAMEX argues that the extrinsic evidence conclusively demonstrates that it has the exclusive right to manufacture Meritor products sold to OEMs in Mexico and that although it may not purchase Core Components of Meritor products from third parties, SISAMEX may elect to manufacture such components itself rather than purchase them from Meritor. Meritor disagrees, but for a different reason than the one it advanced at the motion-to-dismiss stage. Meritor argued previously that although SISAMEX had the contractual right to manufacture Meritor products, it lacked the right to manufacture *Components* of Meritor products without Meritor's

---

[1]    "Core Components" are those components of Meritor Products listed in Schedule 1 in the parties' agreements known as "Supply Agreement B" and "Supply Agreement C."

approval. Meritor also argued that Meritor's approval was required to allow SISAMEX to manufacture Core Components of Meritor products instead of purchasing them from Meritor. Now, Meritor appears to concede that the parties' supply agreements permit SISAMEX to manufacture Components of Meritor products, including Core Components, but Meritor insists that SISAMEX can only do so with the approval of a supermajority of SISAMEX's Board of Directors, half of whom are appointed by Meritor. That is, Meritor contends that it has the power, through its appointed Directors, to veto SISAMEX's choice to manufacture components of Meritor's products.

For the reasons discussed below, SISAMEX's motion is granted in part and denied in part. The court agrees with SISAMEX that the extrinsic evidence in the record supports its interpretation of the agreements and concludes that Meritor has not offered evidence that creates a genuine issue of material fact regarding its newly-advanced argument. The court also concludes that Meritor's argument regarding its obligation to provide technical assistance to SISAMEX is a different argument from the one it made at the motion-to-dismiss stage, and this new argument is also not supported by sufficient evidence to create a genuine issue of material fact. Finally, the court concludes that, given the court's interpretations of the parties' agreements and the undisputed facts, Meritor is in breach of the parties' agreements by refusing to purchase certain Meritor products from SISAMEX. Because there are genuine issues of material fact concerning matters relating to third-party vendors, however, the court cannot determine at this stage that Meritor has breached the parties' agreements with regard to those matters.

**BACKGROUND**

I.     **Pre-Agreement History**

The parties had a business relationship well before negotiation of the agreements at issue here, and both sides have presented evidence about the history of that relationship, which sheds some light on the meaning of the joint venture agreements. Before forming SISAMEX,

Meritor and Quimmco were parties to another Mexico-based joint venture named Dirona, S.A. ("Dirona"). (Quimmco and SISAMEX's Rule 56.1 Stmt. of Undisputed Facts (hereinafter "SMX 56.1 Stmt.") [231] ¶ 3.) Quimmco held a 60% stake in Dirona, while Meritor's predecessor in interest, Rockwell, held a 40% minority share. (Meritor's Resp. to SISAMEX's and Quimmco's Rule 56.1 Stmt. of Undisputed Facts (hereinafter "Meritor 56.1 Resp.") [249] ¶ 3a.) A "Technical Licenses and Non-Compete" agreement between Dirona and Rockwell provided that Rockwell would grant Dirona access to its intellectual property to allow Dirona to manufacture Rockwell products for Mexico-based OEMs. (*Id.* ¶ 3b.) Despite attempts to renew the agreement, it expired in 1998. (*Id.* ¶ 3c.) Though the joint venture persisted and the parties maintained a peaceful coexistence for some time, Meritor entered a more aggressive phase of its relationship with Dirona in 2000 and was competing globally with the joint venture by June of that year. (*Id.* ¶¶ 3c–3d, 6d.) In October 2002, Quimmco and Meritor executed the Shareholders Agreement, which restructured Dirona into SISAMEX, a joint venture in which Meritor held a 50%-minus-one-share ownership stake and Quimmco held the remaining 50% plus one share. (SMX 56.1 Stmt. ¶ 18.)

The two sides present different accounts of the parties' motivations for restructuring Dirona. It is undisputed that in 2000, Meritor planned to terminate the supply of certain Components it had been selling to Dirona, to raise prices on certain Components it did provide to Dirona, and to launch more aggressive sales efforts to "go-after" some of Dirona's customers. (*Id.* ¶ 3; Internal Meritor Letter from B.A. Arnold, 5/3/00, Ex. 8 to SISAMEX's Mot. for Partial Summ. J. [232-8], at-93.)[2] It is also undisputed that Quimmco entered into negotiations with Daimler Chrysler Aktiengesellschaft ("Daimler"), one of Meritor's largest OEM customers, and executed a Memorandum of Understanding in April 10, 2000 concerning the establishment of a

_____

[2]     In the remainder of the opinion, the court will refer to exhibits attached to SISAMEX's Motion for Partial Summary Judgment as "SMX Ex. __" and to exhibits attached to Meritor's Opposition as "Meritor Ex. __." Citations of page numbers in exhibits will be to the final two numbers in the Bates Number provided on the page—for example, "-01."

joint venture between Quimmco and Daimler. (SMX 56.1 Stmt. ¶¶ 4–5.) As part of the agreement between Quimmco and Daimler, Quimmco would seek to acquire Meritor's minority share in Dirona. (*Id.* ¶ 5.) According to SISAMEX, Meritor also determined to prevent Quimmco from forming a partnership with Daimler. (*See, e.g.*, Internal Meritor Letter from B.A. Arnold, 6/9/00, SMX Ex. 13 [232-13], at -28 ("Blocking the [Daimler] outcome is very important and worth a significant amount.").) SISAMEX contends that, in order to deter Quimmco from entering into such a partnership, Meritor offered to restructure Dirona to provide the restructured entity with exclusive rights to manufacture Meritor products for OEMs located in Mexico. (SMX 56.1 Stmt. ¶ 8.)

Meritor denies that its motivation in restructuring Dirona was to block the Quimmco-Daimler partnership or that it offered exclusive manufacturing rights to the restructured entity. Meritor insists that SISAMEX overstates the extent to which Meritor was concerned about a potential Quimmco-Daimler partnership because Meritor had the ability to block the sale of Dirona to Quimmco and Daimler by refusing to sell its shares. (*Id.* ¶ 6d.; Internal Meritor Letter from B.A. Arnold, 6/9/00, SMX Ex. 11 [232-11], at -61 ("[A]s a shareholder, [Meritor] would prevent any agreement of any sort in this regard . . . . Meritor would not sell its shares.").) Meritor contends it was motivated to restructure Dirona in order to enhance Meritor's control over the joint venture. (Meritor's Local Rule 56.1(b)(3)(C) Stmt. of Add'l Facts (hereinafter "Meritor 56.1 Stmt. Add'l Facts) [249], ¶ 1.)

Regardless of the parties' reasons for doing so, representatives from Quimmco and Meritor met to discuss the terms of agreements to restructure Dirona into the joint venture that would become SISAMEX (referred to at the negotiation stage as "NewCo"). Through the course of the parties' negotiations, Brad Arnold acted as lead negotiator for Meritor, and Jesus Barrera acted as lead negotiator for Quimmco. (SMX 56.1 Stmt. ¶ 13.) According to Meritor employee Thomas Gosnell, the other Meritor employees responsible for negotiating the Dirona restructuring were Larry Burgin and Larry Dowers. (Decl. of Thomas Gosnell, Meritor Ex. 8

[250-8], ¶ 1.)  Both Meritor and SISAMEX cite to pre-agreement notes of the negotiators, communications between the negotiators themselves, internal communications between the negotiators and the parties they represented, as well as a Memorandum of Understanding ("MOU") Quimmco and Meritor executed in September 2000.  Predictably, the parties highlight different aspects of those documents.  SISAMEX points to those materials to emphasize that it negotiated for the exclusive right to manufacture Meritor products sold to OEMs in Mexico.  To support this assertion, for example, SISAMEX notes that section 2(c) of the MOU provides that "NewCo [SISAMEX] would be the exclusive manufacturer of and shipping point for Meritor Products and Dirona Products sold by Meritor to OEM's plants located in Mexico" and also states that Meritor would receive a "5% margin . . . to reflect administrative, sales, marketing, and engineering expenses incurred by Meritor."[3]  (Mem. of Understanding, 9/5/00 (hereinafter "September 2000 MOU"), SMX Ex. 16 [232-17], § 2(c).)  As another example, SISAMEX cites to a business plan outline, forwarded by Arnold, reflecting that the joint venture's operations would include manufacturing—and developing the capacity for manufacturing—"core component[s]" of Meritor products.  (Business Plan Outline, 11/7/00, SMX Ex. 20 [232-21], at -29.)

Meritor emphasizes different portions of the parties' pre-agreement negotiations and documents.  It points to evidence that Meritor wanted equal control over the management of the joint venture, including control and veto rights over the joint venture's "key activities," such as its annual operating plan and capital expenditures.  Evidence that Meritor sought such control, and that Quimmco agreed to grant it, includes reports, emails, and presentations from Arnold to Meritor management regarding the negotiations. (*See, e.g.*, Internal Meritor Letter from B.A. Arnold, 4/27/00, Meritor Ex. 4 [250-4], at -60 (relaying conversation about reformulating Dirona as a "50/50 arrangement"); Internal Meritor Letter from B.A. Arnold, 5/3/00, SMX Ex. 8 [232-8],

_____

[3]        SISAMEX notes that the parties specifically revised the MOU's final terms to make clear that SISAMEX would be the "exclusive," rather than merely the "primary," manufacturer.  (SMX 56.1 ¶ 9; Meritor 56.1 Resp. ¶ 9c.)

at -94 (same); Email from Bradley Arnold, 8/21/01, Meritor Ex. 16 [250-16], at -05 (listing imperatives in the negotiations, including "that these documents allow veto rights for certain critical matters such as annual operating p[l]ans, capital expenditures and the like").)  Meritor also highlights references to the parties' intention to restructure Dirona to become a "Tier 2" supplier to Meritor.  (*See, e.g.*, Arnold Report, 8/11/01, SMX Ex. 35 [232-36] (indicating Quimmco agreed that Dirona would become a joint venture "with a new Tier 2 mission").)  A Tier 2 supplier, Meritor explains (and SISAMEX does not dispute), is "a manufacturing entity that enters an agreement with a Tier 1 supplier to make whatever Components or products the Tier 1 requests."  (Meritor Stmt. Add'l Facts ¶ 12.)

## II.    The Agreements

Quimmco and Meritor officially executed a Shareholders Agreement for the restructuring of Dirona on October 25, 2002.  (Shareholders Agreement, SMX Ex. 1 [232-1], at -14.)  Under that agreement, Dirona was restructured into SISAMEX, and the scope of its business would be as follows:

> (i)    to manufacture for, and sell exclusively to, [Meritor], Meritor Products, Dirona Products and Sudisa [SISAMEX's subsidiary[4]] Products for sale to OEM Customers in Mexico;
>
> (ii)    to manufacture for, and sell exclusively to [Meritor] and its Affiliates, Core Components and Non-Core Components[5] for use by them worldwide;
>
> (iii)    to manufacture and sell Company [that is, SISAMEX] Products to any customer worldwide.

(*Id.* at "Where as" Clause(g)(6).) The Shareholders Agreement also provides that SISAMEX's business must be conducted according to a Business Plan developed by SISAMEX's Director

---

[4]    "Sudisa" refers to Super Diesel, S.A. de C.V., a Mexican corporation and wholly-owned subsidiary of Dirona that became a wholly-owned subsidiary of SISAMEX upon the joint venture's restructuring.  (*See* Shareholders Agreement at Whereas Clause (e).)

[5]    A "Non-Core Component" is (a) any Meritor Component or a Meritor Product that is not listed as a "Core Component" in Schedule 1 of Supply Agreement B or (b) any Dirona Component, Dirona Product, Sudisa Component, or Sudisa Product.  (*See* Shareholders Agreement at -28; Supply Agreement B, SMX Ex. 55 [233-5] at -95–96.)

General and approved by the company's board of directors. (*Id.* § 2.3(a).) The initial Business Plan would cover SISAMEX's first five years of operations and would thereafter by updated at least once a year by the Director General and presented to the Board of Directors for approval. (*Id.*) Under the Shareholders Agreement, Quimmco nominates the Director General, subject to Meritor's approval, which Meritor may not unreasonably withhold, and the Director General serves for a two-year term, subject to renewal for additional one-year terms. (*Id.* ¶ 3.5.3(b).) In addition to the initial Business Plan, the Shareholders Agreement calls for the execution of three Supply Agreements (Supply Agreements A, B, and C) between SISAMEX and Meritor. (*Id.* § 7.3(k)-m).) The parties executed the initial Business Plan and the three Supply Agreements on January 14, 2003. (Business Plan 2003–2007, SMX Ex. 68 [233-18], at -08; Supply Agreement A, SMX Ex. 36 [232-37], at -30; Supply Agreement B, SMX Ex. 55 [233-5], at -93; Supply Agreement C, SMX Ex. 56 [233-6], at -79.) In ruling on the parties' motions to dismiss, this court has already discussed extensively the provisions of the three supply agreements. *See, e.g.*, *Sistemas Automotrices de Mexico, S.A. de C.V., v. Meritor Heavy Vehicle Sys., LLC*, No. 14 C 5289, 2015 WL 390790 (hereinafter "MTD Opinion"), at *3–4 (N.D. Ill. Jan. 28, 2015). At this point, the court need only summarize and highlight certain key provisions of the Business Plan and the Supply Agreements.

The initial Business Plan outlines SISAMEX's objectives, structure, and business strategy, and discusses the products in its portfolio, projected market volumes, competing firms, operations, financial statements, the company's capital plan, and a time schedule for the company's restructuring. (*See generally* Business Plan 2003–2007.) In describing SISAMEX's primary function, the plan says that SISAMEX's business scope will "be primarily the manufacturing of axles, brakes, related Components and assemblies for medium and heavy-duty commercial vehicles." (*Id.* at -10.) SISAMEX will, the plan continues, "produce all [Meritor's] products supplied to OEM plants located in Mexico, as well as manufacturing Components for [Meritor's] global axle and brake business." (*Id.*)

The Supply Agreements elaborate on the scope of the relationship between SISAMEX and Meritor. Supply Agreement A concerns Meritor Products that Meritor sells to OEMs in Mexico; the agreement provides that SISAMEX will supply Meritor with all such Products that Meritor requires. (Supply Agreement A § 2.1.) The agreement establishes an exclusive purchasing arrangement: SISAMEX may not sell Meritor Products to anyone else but must provide Meritor with all the Products it requires for resale to Mexican OEMs, and Meritor must purchase all of the Products it sells to Mexican OEMs from SISAMEX and not from anyone else. (*Id.* §§ 2.1–2.2.) Supply Agreement B concerns Products Meritor sells worldwide; the agreement provides that SISAMEX will supply Meritor with certain Components of those Products, based on Meritor's orders. (Supply Agreement B § 2.2(a).) Specifically, Meritor agreed to purchase, and SISAMEX agreed to supply, "a percentage of [Meritor's] requirements for Core Components for original equipment use in products for OEM Customers in the United States and Canada" as provided in a schedule attached to the agreement." (*Id.* § 2.2(b).) Whereas Supply Agreements A and B require SISAMEX to supply Products and Components to Meritor, Supply Agreement C concerns Components that SISAMEX must purchase from Meritor. Specifically, the agreement requires SISAMEX to purchase from Meritor the "Core Components" it requires to fulfill its obligations under Supply Agreements A and B, although SISAMEX is only required to purchase from Meritor the Core Components that SISAMEX "does not manufacture itself." (Supply Agreement C § 2.2(a).) In addition, Supply Agreement C provides the following exceptions from SISAMEX's purchasing obligation:

> (a)      Core Components for which [Meritor] is unable or unwilling to supply to [SISAMEX] to meet the delivery, quality or other terms and conditions of this Agreement or [Meritor's] customers.
>
> (b)      Core Components which [SISAMEX] and [Meritor] have agreed to be an exception to the purchase commitments of this Agreement.
>
> (c)      Core Components during a Force Majeure Event . . . .

(*Id.* § 2.4.) Under any of those three circumstances, SISAMEX "shall be entitled to manufacture

such Components itself and/or to source such Components from [other suppliers.]" (*Id.*)

### III. History of Performance

For several years, the parties had a good working relationship. As SISAMEX built up its manufacturing capacity, Meritor acknowledged that it needed to commit to transferring its manufacturing business for the Mexican OEM market to SISAMEX. (*See* SMX Stmt. ¶ 39; Meritor 56.1 Resp. ¶ 39a.) Because SISAMEX would "get to make [the Meritor] products as soon as [SISAMEX] c[ould] tool and integrate," Larry Burgin arranged for Meritor to provide SISAMEX with technical specifications for all of Meritor's products and Components that Meritor sold to OEMs in Mexico. (Email from Larry Burgin, 11/18/2002, SMX Ex. 81 [233-31], at -65.) Initially, SISAMEX purchased from Meritor, under Supply Agreement C, the Core Components required to assemble Meritor's "160 axle," which it sold to Meritor pursuant to Supply Agreement A. (SMX 56.1 Stmt ¶ 42; Meritor 56.1 Resp. ¶ 42b.) Eventually, however, SISAMEX developed the capacity to "insource" (that is, manufacture itself) the Core Components of the 160 axle. (*Id.*) And by 2004, SISAMEX had integrated or insourced most of the Core Components of that product. (*Id.*) In 2003, SISAMEX also began insourcing "145 housings," a Core Component of the "145 axle." (SMX 56.1 ¶ 45; Meritor 56.1 Resp. ¶¶ 45a-45b.)

By 2009, in the midst of the global financial crisis and recession, both SISAMEX and Meritor faced business concerns. In February 2009, SISAMEX informed Meritor that it was nearly out of cash and risked breaching financial covenants with its creditor banks. (Meritor 56.1 Stmt. of Add'l Facts ¶ 33.) And as of May 2009, Meritor was concerned that migration of NAFTA truck manufacturers (that is, OEMs) from the United States and Canada to Mexico would be harmful to Meritor, especially if SISAMEX began insourcing additional Components of Meritor products, thus eating into Meritor's manufacturing margin for sales to those OEMs. In a Meritor report on SISAMEX strategy, for example, Meritor observed that expected OEM migration to Mexico would expose Meritor to a $10 million annual adverse impact on earnings

"assuming SMX fully integrates the manufacturing content of all products (e.g. [the so-called "-14_ series" products and Components])."  (Meritor Axle Business Unit Review, 5/4/09, SMX Ex. 127 [234-27], at -62.)

Around that time, Meritor approached SISAMEX to propose amending the Supply Agreements to require SISAMEX to purchase the "14_ series" Core Components from Meritor instead of insourcing them.  (SMX 56.1 Stmt. ¶ 60; Meritor 56.1 Resp. 60b-60c.)  In exchange, Meritor proposed, it would purchase additional Components from SISAMEX under Supply Agreement B.  (SMX 56.1 Stmt. ¶ 60; Meritor 56.1 Resp. 60c.).  In November 2010, following months of negotiations between the parties, SISAMEX and Meritor executed a temporary agreement, the Interim Purchasing Commitments Agreement ("IPCA").  (*See* IPCA, SMX Ex. 151 [235-1].)  Under the IPCA, SISAMEX agreed not to insource 14_ series carriers and to waive Meritor's obligation under Supply Agreement B to purchase "16_ series" housings from SISAMEX, and in exchange, Meritor agreed to purchase additional Components under Supply Agreement B and to decrease the cost of 14_ series carrier assemblies it would provide to SISAMEX by moving production of those assemblies from the United States to Mexico.  (*Id.*)  The IPCA provided expressly that it would expire at the end of 2013 and that it did not modify or replace the terms of the Supply Agreements.  (*Id.*)

In October 2012, SISAMEX's Director General informed SISAMEX's Board of Directors, including Directors appointed by both Quimmco and Meritor, that upon expiration of the IPCA at the end of 2013, SISAMEX planned to manufacture 14_ series carrier assemblies and gear sets, which are considered Core Components under Supply Agreement C.  (SMX 56.1 Stmt. 64; Meritor 56.1 Resp. ¶ 64a.)  As reflected in emails between Meritor employees during that month, the announcement was not welcome.  Meritor was concerned about the financial harm that would result from SISAMEX's insourcing of those Components and tried to find alternatives to avoid losing the 14_ business.  (*See*, *e.g.,* Email from Gallegos Osvaldo, 10/16/12, SMX Ex. 158 [235-8], at -43 ("We discussed [SISAMEX's] intentions to industrialize the 14x carrier

assembly and gear cutting; as a result we are looking into several options in order to maintain that business in our plants."); Email from Osvaldo Gallegos, 10/18/12, SMX Ex. 160 [235-10], at -66 ("I believe [SISAMEX's] threat [to insource the 14x Components] is real, so we must find alternatives to this situation.").)

In November 2013, SISAMEX's Director General presented the 2014 Business Plan to the Board of Directors for approval. The Business Plan formally revealed SISAMEX's intention to insource the 14_ Components. (Meritor Letter from Timothy P. Burns, 12/2/13, Meritor Ex. 63 [250-63], at -45.) Tim Burns, one of the Meritor-appointed Directors of SISAMEX, wrote to Quimmco and the SISAMEX Director General to inform them that Meritor was exercising its right to elect that the 2014 Business Plan be presented to the SISAMEX Shareholders. (*Id.*) Shareholder approval was required, according to Burns, because SISAMEX's insourcing of Components (including the 14_ Components) represented "a change in the business of SISAMEX and . . . a proposed manufacturing activity which is not contemplated by" the Shareholders Agreement. (*Id.* at -46.) Burns noted that Section 3.5.2.(f) of the Shareholders Agreement allowed any Director of SISAMEX "to elect at any time that any matter which would otherwise require approval of the Board of Directors . . . shall instead by submitted for approval by the Shareholders . . . ." (*Id.*; Shareholders Agreement § 3.5.2(f).) He also noted that under Section 3.5.1(a)(viii) of the Shareholders Agreement, approval of the Shareholders is required for any "change in the business of the Company or any manufacture or sale of any products other than as contemplated in Section 2.1(b)." (Shareholders Agreement § 3.5.1(a)(viii).) At the December meeting of the Board of Directors, the Meritor-appointed members of the Board of Directors declined to approve the 2014 Business Plan (SMX. 56.1 Stmt. ¶ 69; Meritor 56.1 Resp. ¶ 69c), and Meritor asserts that SISAMEX did not separately present the Business Plan to the Shareholders for their approval. (Meritor's Mem. in Opp'n to Mot. for Partial Summ. J. (hereinafter "Meritor Resp.") [248] at 2.) As a result, Meritor contends, SISAMEX is not authorized to manufacture the 14_ series axles or Components (or to assemble the 185 axle,

which SISAMEX had previously purchased as a completed product).

## IV.     This Action

After exhausting the dispute resolution process set forth in the parties' agreements, SISAMEX brought this suit on July 10, 2014.  SISAMEX's complaint sought (1) a declaration that SISAMEX has the exclusive right under Section 2.2 of Supply Agreement A to manufacture Meritor Products, including all component parts thereof, for sale by Meritor to Mexican OEMs; (2) a declaration that SISAMEX has the right under Supply Agreements A and B to obtain production materials from third-party vendors without Meritor's pre-approval; (3) a declaration that the Shareholders Agreement obligates Meritor to provide requisite technical assistance to SISAMEX for the manufacture of Meritor Products; and (4) damages arising from various claims for breach of contract and other statutory and common law duties.  Three days after SISAMEX brought suit, Meritor filed its complaint against SISAMEX and Quimmco.  Meritor's complaint seeks (1) a declaration that SISAMEX may not insource or outsource the production of any Meritor component without the consent of both Meritor and Quimmco as Shareholders, and damages for SISAMEX's breach of that prohibition; and (2) a declaration that SISAMEX must purchase all of its requirements for Core Components from Meritor unless the Shareholders have mutually agreed otherwise, and damages for SISAMEX's breach of that obligation.  In August 2014, both sides moved to dismiss the other's complaint.

On all but one count in SISAMEX's complaint,[6] the court denied the parties' motions to dismiss.  In its briefing on the motions and in its complaint, SISAMEX relied in part on Section 2.2 of Supply Agreement A to argue that it had the right to insource Components of Meritor products.  That section states that Meritor "shall purchase exclusively" from SISAMEX and SISAMEX "shall supply" to Meritor, "all of [Meritor's] requirements" for Meritor Products sold by

_____

[6]     The court concluded that under Supply Agreements A and B, SISAMEX's purchasing of materials from third-party vendors may be subject to Meritor's approval, and thus SISAMEX could not state a claim entitling the company to a declaration that it could obtain such materials without Meritor's pre-approval.  *See* MTD Opinion, 2015 WL 390790, at *12–13.

Meritor to OEMs in Mexico. (Supply Agreement A § 2.2(a).) The section also provides that SISAMEX "shall be the exclusive importers, manufacturers, assemblers, and/or shipping points of" Meritor Products sold by Meritor to OEMs in Mexico. (*Id.* § 2.2(b).) According to SISAMEX, these provisions make clear that SISAMEX has the exclusive right to manufacture Meritor Products, which implies the exclusive right to manufacture the Components of those Products. Meritor, however, insisted that although Section 2.2 of Supply Agreement A grants SISAMEX the right to manufacture Meritor Products, it says nothing about the right to manufacture Components of those products and thus does not grant any such right.

In briefing the motions to dismiss, Meritor argued that Supply Agreement C confirms that SISAMEX lacks the unilateral right to manufacture, or insource, Components of Meritor Products. Section 2.2 of that agreement obligates SISAMEX to purchase its requirements for "Core Components" of Meritor Products "exclusively from [Meritor]" (Supply Agreement C § 2.2(a)), and SISAMEX is only released from its purchasing obligation where (a) Meritor is unable or unwilling to supply the Components, (b) the parties have agreed that certain Components will be excepted from the Agreement, or (c) there is a force majeure event. (*Id.* § 2.4.) Thus, according to Meritor, SISAMEX may not unilaterally decide to insource Components of Meritor products; rather, it must purchase them from Meritor unless one of the three exceptions from Section 2.4 of Supply Agreement C applies, such as an agreement between the parties. SISAMEX, for its part, pointed out that Section 2.2(a) of Supply Agreement C actually says that SISAMEX must purchase its requirements for Core Components from Meritor only for those Components "that [SISAMEX] does not manufacture itself," implying that SISAMEX can decide for itself whether it will manufacture Components of Meritor Products or purchase them from Meritor. (*Id.* § 2.2(a).) Meritor responded to that argument in the motion-to-dismiss briefing by noting that where one of the three exceptions to the purchasing requirements applies, SISAMEX "shall be entitled to manufacture" the Components itself or to source them from other providers, implying that SISAMEX is not entitled

to manufacture the Components itself unless one of the three exceptions listed in Section 2.4 applies.  (*Id.* § 2.4.)

The court opined that the text of the agreements suggests SISAMEX has the right to manufacture *some* component parts of Meritor products, but the court ultimately concluded that without extrinsic evidence to assist in the interpretation of Supply Agreements A and C, the agreements were ambiguous with respect to the "central question" of "which party has the authority to decide which Core Components SISAMEX may manufacture."  MTD Opinion, 2015 WL 390790, at *9.  The court also denied Meritor's motion to dismiss with respect to SISAMEX's claim that Section 2.2(e) obligates Meritor to provide technical assistance to SISAMEX for the manufacture of Meritor Products.  As a third-party beneficiary to the Shareholders Agreement, SISAMEX has standing to bring that claim, the court ruled, *see id.* at *13, and Meritor's practice of providing assistance supported SISAMEX's allegation that Meritor had an obligation to do so.  (Tr. of Proceedings for Oral Arg. on Mot. to Reconsider, 3/2/15 [102], at 3:7–14.)

SISAMEX amended its complaint after the court ruled on the motions to dismiss.  In the new complaint, SISAMEX seeks (1) a declaration that "SISAMEX has the exclusive right under Section 2.2 of Supply Agreement A to manufacture Meritor Products, including all Components thereof, for sale by Meritor to OEM customers in Mexico" (SISAMEX's Second Am. Compl. [109] ¶ 69); (2) a declaration that Meritor is "obligated under the Shareholders Agreement to provide requisite technical assistance to SISAMEX for the manufacturing of Meritor Products" (*id.* ¶ 78); and (3) damages for Meritor's purported breach of its obligations under Supply Agreements A and B.  SISAMEX now seeks partial summary judgment on all three counts in its complaint, as well as the four counts in Meritor's complaint.  SISAMEX contends that the evidence uncovered during discovery unequivocally shows that the parties intended to grant SISAMEX the right to be the exclusive manufacturer of Meritor Products, including Components thereof, and that Meritor assumed the obligations to provide SISAMEX with the technical engineering support necessary to manufacture Meritor Products.  Meritor insists that there are genuine disputes of material fact

concerning these issues and that summary judgment would therefore be inappropriate.

The court has subject matter jurisdiction over the case because the parties are diverse and the matter in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a). Although the parties do not rely heavily on case law to support their arguments, it is undisputed that Michigan law governs the interpretation of the contracts. (Shareholders Agreement § 9.11(b); Supply Agreement A § 13.15(b); Supply Agreement B § 13.15; Supply Agreement C § 11.5(b).) The court addresses the parties' arguments below.

## DISCUSSION

Courts grant summary judgment where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). With the court viewing the evidence in the light most favorable to the non-moving party, the moving party "must make an initial showing that the agreed-upon facts support a judgment in its favor." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). Once the moving party makes such a showing, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A factual dispute is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Id.* "Mere metaphysical doubt as to the material facts is not enough." *Id.* In the context of interpreting a contract, for example, the mere fact that the contract's language is ambiguous is not sufficient to establish a genuine issue of material fact. *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). If a contract is ambiguous, the court still must determine "whether after consideration of the extrinsic evidence, there are any triable issues of fact." *Id.* at 1389.

The court ruled earlier that the relevant contractual provisions are ambiguous with respect to the "central question" of who decides which Core Components SISAMEX may produce. MTD Opinion, 2015 WL 390790, at *9. In considering whether the extrinsic evidence in the record reveals any disputes of fact on that issue, the court notes at the outset that the

overwhelming bulk of the evidence in this case is documentary: in connection with the summary judgment briefs and statements of fact, the parties have submitted a total of more than 250 exhibits including the agreements, written communications between the parties, internal communications and admissions, and other documentary evidence of the parties' course of performance. Only a handful of those exhibits make reference to any matter that would be the subject of trial testimony. Were this case to proceed to a trial by jury or to the bench, therefore, the trier of fact would base its findings on largely the same documentary evidence that is before the court now. As discussed more fully in Section I below, the court believes the only reasonable conclusion that can be drawn from that evidence—in particular, the evidence of the parties' history of performance and Meritor's own admissions about the agreements' meaning— is that SISAMEX has the contractual right to decide unilaterally to insource Components of Meritor Products that Meritor sells to OEMs in Mexico. Meritor insists that there are genuine issues of material fact on this point and offers testimony to dispute SISAMEX's evidence. But, as the court discusses more fully below, the testimony Meritor offers does not create a genuine issue of fact, or require a credibility determination, because the testimony contains "[c]onclusory allegations, unsupported by specific facts," *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003), or because the testimony constitutes a "one-sided, self-serving interpretation by one party" that is irrelevant to a jury's or a court's interpretation of a contract, *Davis v. Kramer Bros. Freight Lines*, 361 Mich. 371, 376, 105 N.W.2d 29, 31–32 (1960).

I.      **SISAMEX's Right to Manufacture Components of Meritor Products without Meritor's Consent (SISAMEX's Count I and Meritor's Count I)**

SISAMEX's position is that Section 2.2 of Supply Agreement A grants SISAMEX the right to be the exclusive manufacturer of Meritor Products, including Components thereof, that are sold by Meritor to OEMs in Mexico. There is considerable evidentiary support for that position. The parties' pre-contractual MOU, for example, stated expressly that "[SISAMEX] would be the *exclusive manufacturer* of and shipping point for Meritor Products and Dirona

Products sold by Meritor to OEM plans located in Mexico." (September 2000 MOU § 2(c) (emphasis added).) In 2002, to take another example, Quimmco's CEO Jesus Barrera made a speech to the media, attended by Brad Arnold and other Meritor executives, announcing the Dirona restructuring. (SMX 56.1 Stmt. ¶ 34.) In his description of the restructuring, Barrera explained that the new joint venture "will have the *right to manufacture on an exclusive basis*, among other products, Meritor axles and brakes for Mexico." (Ing. Jesus L. Barrera Lozano, "Announcement to the Press and Media of the Dirona Restructuring," SMX Ex. 73 [233-23], at -29.) The text of Supply Agreement A supports SISAMEX's position, as well: That agreement provides that for Meritor Products sold to OEM customers in Mexico, "[Meritor] shall purchase [all of its requirements] exclusively from [SISAMEX]" (Supply Agreement A § 2.2(a)), and that "[SISAMEX] shall be the exclusive importers, manufacturers, assemblers and/or shipping points of" Meritor Products sold by Meritor to OEM customers in Mexico. (*Id.* § 2.2.(b).) Under Section 2.3 of that Agreement, Meritor is entitled to manufacture such Products itself or to source them from other suppliers if SISAMEX is unable or unwilling to supply the Products to meet the terms of the Agreement (*id.* § 2.3(a)), or where Meritor and SISAMEX agree that certain Products will be an exception to the Agreement's purchasing commitments. (*Id.* § 2.3(b).)

At the motion-to-dismiss stage, Meritor argued that SISAMEX's reading of Supply Agreement A was mistaken because although Section 2.2 grants SISAMEX the right to manufacture Meritor Products, it says nothing about whether SISAMEX has the right to manufacture *component parts* of those Products. (*See* Meritor's Mem. in Supp. of Mot. to Dismiss [25] at 4.) In addition, Meritor argued that the use of the "and/*or*" phrase in Section 2.2.(b) indicates that "exclusive manufacturer" is just one of the *possible* roles that SISAMEX could play, in addition to the possible roles of exclusive importer, exclusive assembler, or exclusive shipping point. (Meritor's Reply Mem. in Supp. of its Mot. to Dismiss [66] at 9.)

In response to SISAMEX's motion for summary judgment, Meritor has attempted to present evidence to support its reading of section 2.2. Meritor argues, for example, that Brad

Arnold's testimony regarding the interpretation of Section 2.2(b) creates a question of fact regarding what that section means. (Meritor Resp. at 8.) In a discussion of section 2.2(b) during his deposition, Arnold explained that he believes that language to mean "[t]hat the joint venture has the exclusive right for the delivery of the products to OEMs in Mexico" (Dep. of Bradley Arnold (hereinafter "Arnold Dep."), SMX Ex. 14 [232-14], 78:15–19:8), and continued that "this language doesn't have anything to do with the manufacturing content of the product, I don't believe." (*Id.* 79:16–18.) Arnold, however, did not provide specific facts on which he based this interpretation or even suggest that his understanding of the provision at issue was informed by his memory of the negotiations. He stated expressly that "again, I'm giving you my interpretation." (*Id.* 80:2–3.) Such a "one-sided, self-serving interpretation by one party" is not appropriate evidence to consider in interpreting a contract and is certainly inadequate to create a genuine issue of fact for a jury. *Davis*, 361 Mich. at 376, 105 N.W.2d at 31–32. Were such an interpretation sufficient to defeat summary judgment, every contract dispute would go to trial because every party could create a question of material fact by offering its preferred interpretation as evidence. And, as discussed below, Arnold's proposed interpretation is contradicted by his own internal admissions and admissions of other Meritor employees.

In addition to Arnold's testimony, Meritor attempts to support its argument that "exclusive manufacturer" was merely a potential role that SISAMEX could play by citing to numerous examples of communications between the parties confirming that SISAMEX would act as the exclusive delivery or shipping point for Meritor Products sold by Meritor to OEMs in Mexico. (*See, e.g.*, Meritor 56.1 Stmt. Add'l Facts ¶ 7.) Meritor suggests that because the parties emphasized SISAMEX's role as shipping point, they did not envision that SISAMEX would also play the role of exclusive manufacturer. Meritor also emphasizes terms in numerous documents that, Meritor contends, show that the parties intended the joint venture to function as a "Tier 2" supplier. (*See, e.g.*, *id.* ¶¶ 12–13.) But none of this evidence creates a genuine issue of material fact for trial. Whether the parties understood SISAMEX to be the exclusive shipping or

delivery point, or whether SISAMEX was established as a Tier 2 supplier, is immaterial to the question of whether SISAMEX has the exclusive right to manufacture Meritor Products and the Components thereof.

Nothing, for example, in the definition of "Tier 2 supplier" that Meritor has provided establishes that such a supplier could not also be the exclusive manufacturer of the products it supplies. (*See id.*) Indeed, SISAMEX concedes that it is a Tier 2 supplier but points out that the joint venture's manufacturing rights "are determined by the Agreements, not labels such as 'Tier 2' or 'contract manufacturer.'" (SISAMEX's Resp. to Meritor's 56.1 Stmt. Add'l Facts (hereinafter "SISAMEX 56.1 Resp.") [268] ¶ 13.) Regarding the issue of SISAMEX's role as exclusive shipping or delivery point, SISAMEX's acting as the exclusive shipping point for Meritor Product sold to OEMs in Mexico does not preclude the possibility that it would also act as the exclusive manufacturer of those products. Notably, Meritor's recognition that SISAMEX had the right to act as the exclusive shipping point appears to rest on in Section 2.2 of Supply Agreement A, which states that SISAMEX "shall be the exclusive importers, manufacturers, assemblers and/or shipping points of Meritor Products . . . ." (Supply Agreement A § 2.2.(b).) In that section, both "shipping points" and "manufacturers" are modified by the adjective "exclusive." *Cf. Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920) ("When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all."). As Meritor concedes that Supply Agreement A grants SISAMEX the right to be the exclusive shipping point, it is not clear why the provision establishing that right would not also grant SISAMEX the right to be the exclusive manufacturer of those products.

As noted, Meritor earlier argued that SISAMEX has the right to manufacture Meritor Products, but not their component parts. In response to that contention, SISAMEX presents evidence that it did in fact manufacture Components of Meritor Products over the course of the parties' dealings and that the parties understood SISAMEX's exclusive manufacturing rights to

include the right to manufacture such Components.  (*See, e.g.,* Arnold Dep. 106:12–20 (Arnold agreeing "generally" that "when Supply Agreement A grants SISAMEX the right to manufacture [a Meritor Product], it is granting SISAMEX the right to manufacture [that Product's component parts]"); Email from Larry Burgin, 11/18/2002, at -65 (discussing "logistics of [SISAMEX's] making all housing, carriers, shafts, etc. [Components of Meritor Products] and indicating that SISAMEX would need specifications for all Meritor Products, and Components thereof, sold to OEMs in Mexico because "SISAMEX will get to make these products as soon as they can tool and integrate").)

Perhaps recognizing the strength of the evidence against the position it has taken throughout this litigation, Meritor now appears to abandon its argument that SISAMEX lacks a contractual right to manufacture Components of Meritor Products without Meritor's approval. Thus, in Meritor's response brief, it concedes that "[s]ome of [Meritor's internal documents] acknowledge that SISAMEX has the right to insource Components of Meritor Products, which Meritor does not dispute . . . ."  (Meritor Resp. at 2.)  But SISAMEX only has that insourcing right, Meritor now insists, "so long as such insourcing is pursuant to a Board-approved Business Plan or agreed by the parties."  (*Id.*)  Thus Meritor takes the court's framing of the central issue in this case (*see* MTD Opinion, 2015 WL 390790, at *9 ("[Which party [that is, SISAMEX or Meritor] has the authority to decide which Core Components SISAMEX may manufacture.")), and reformulates the question as "who decides?  SISAMEX's Board of Directors or its Director General without Board approval?"  (Meritor Resp. at 1.)

The court concludes that Meritor's new "Board approval" argument fails because it (1) is not supported by specific facts, (2) is contradicted by the plain text of the parties' agreements, and (3) is irreconcilably inconsistent with the parties' history of performance and the history of this litigation.  Ultimately, no reasonable fact finder could credit Meritor's position based on the evidence in the case.  Meritor devotes considerable space in its response brief, for example, to showing that Meritor bargained for equal or joint control over management of the joint venture

through the company's Board of Directors.  (*See, e.g.*, Meritor Resp. at 3–6, 9–11.)  Some evidence in the record suggests that Meritor does not control SISAMEX's operations to the extent it desires.  (*See, e.g.*, SISAMEX 56.1 Stmt. ¶ 37.)  But even if the court credits Meritor's position and assumes that Meritor shares equal control with Quimmco over SISAMEX's Board of Directors and that the Board of Directors has authority over certain key strategic decisions, it does not immediately follow that the Board of Directors has the authority to veto decisions about what Meritor Products and Components SISAMEX manufactures.  Whether the Board of Directors has that authority is determined by the language of the Agreements, and the court can only speculate that Meritor's equal control over key strategic decisions includes the ability to determine whether SISAMEX could insource Meritor products and Components.  Speculation is "insufficient to withstand summary judgment."  *Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015).

The best evidence Meritor has to support its new "Board approval" theory appears to be certain favorable language in the pre-agreement MOU, as well as *post hoc* testimony and declarations from Meritor employees about Meritor's contractual intent.  As Meritor emphasizes, in the September MOU between Quimmco and Meritor, the parties memorialized their expectations about SISAMEX's ability to develop capacity for the insourcing Meritor products and Components.  Section 2(d) of the MOU is titled "Tooling and Capital Investment" and states:

> Decisions with respect to creating capacity for NewCo [SISAMEX] to manufacture Meritor designed products would be based on acceptable economic returns and 'paybacks' driven by market volumes as agreed by the Board of Directors. Subject to the completion of the Business Plan referenced in section 10, it is currently envisioned that NewCo's [SISAMEX's] initial role will be to manufacture the -16x family of Components. Additional roles will be added based on economic 'paybacks' as agreed by the Board of Directors on a case by case basis.

(September 2000 MOU § 2(d).)  This language does appear to support Meritor's contention that the parties intended to give the Board of Directors the power to determine what SISAMEX could

make by controlling the joint venture's ability to make capital expenditures that would create manufacturing capacity. That is not how the language was interpreted at the time, however: A description of the MOU from an internal audit of Meritor's controls and procedures prepared in advance of Dirona's potential restructuring explains that Meritor agreed to "cease manufacturing OEM and replacement parts in Mexico and cease selling replacement parts in Mexico, relinquishing these opportunities to Dirona." (Meritor Internal Controls Audit, SMX Ex. 17 [232-18], at -38.) That description suggests that even if the Board of Directors had the ability to control the joint venture's ability to create manufacturing capacity, the parties still understood that SISAMEX had the exclusive right (over Meritor) to manufacture Meritor Products and parts sold to OEMs in Mexico.

But the more significant difficulty with relying on the language from the MOU is that it appears to be in direct conflict with the language of the Shareholders Agreement that the parties ultimately adopted and executed a little over two years after the MOU. In the section of that agreement dealing with matters requiring Board approval, the Agreement provides expressly that "approval by the Board of Directors shall not be required . . . [for] capital or other expenditures as to Meritor Products, Dirona Products, Sudisa [SISAMEX's subsidiary] Products or Core Components as contemplated by Section 3.4(a)." (Shareholders Agreement § 3.5.2(e)(vi).) The referenced section, section 3.4(a), states as follows:

> [SISAMEX] and Sudisa are required to make all required capital and other expenditures for [SISAMEX] and Sudisa related to establishing capacity or acquiring tooling for the manufacture of any Meritor Products, Dirona Products, Sudisa Products or Core Components to meet the forecasts (as updated from time to time) for such products and Components delivered to [SISAMEX] and/or Sudisa [as contemplated in Supply Agreements A and B] and otherwise for [SISAMEX] and Sudisa to be able to satisfy their obligations under those agreements. [SISAMEX] is authorized, without further approval of the Board of Directors or Shareholders, to borrow from one or more unaffiliated financial institution lenders on market terms, all such sums as may be necessary to finance the capital and other expenditures required under [this section].

(*Id.* § 3.4(a).) The plain reading of these two sections is that SISAMEX is obligated to make capital expenditures to establish capacity for the manufacture of Meritor Products, and Board

approval is not required for SISAMEX to make such expenditures or to borrow funds to finance such expenditures. Thus, the language of the agreements directly refutes Meritor's suggestion that the Board of Directors may thwart SISAMEX's ability to develop manufacturing capacity by withholding approval for capital expenditures to develop that capacity.

Meritor responds to this text-based argument by asserting that the provisions at issue should not be read the way SISAMEX contends because it was *Meritor* who added the relevant language in section 3.4(a) granting SISAMEX flexibility to make capital expenditures. (Meritor 56.1 Stmt. Add'l Facts ¶ 14; SISAMEX and Quimmco's Resp. to Meritor's 56.1 Stmt. Add'l Facts (hereinafter "SISAMEX 56.1 Resp.") [268] ¶ 14.) It would not have added language, Meritor argues, the effect of which would be to reduce its own authority over the joint venture's decisions. Meritor insists that SISAMEX's Director General was granted this authority to make capital expenditures only in the "specific instances where there was a Board-approved Business Plan but no capacity in Meritor's network for meeting the forecast and obligations to meet customer demand, not instances where capacity already existed in Meritor's supply chain but the Director General no longer wanted to purchase from Meritor or those other suppliers' existing capacity." (Decl. of Larry Dowers (hereinafter "Dowers Decl."), Meritor Ex. 19 [250-19], ¶ 26.) The only support Meritor provides for this assertion is a declaration from Meritor employee Larry Dowers, a declaration which Dowers prepared for the purposes of this litigation.

Dowers' restricted reading of section 3.4(a) is not supported by the text of the agreements or by the extrinsic evidence in the record. As SISAMEX points out, the "forecasts" Meritor provides to SISAMEX cover *all* Meritor Products that Meritor expects to sell to OEMs in Mexico over a five-year period. The forecasts are not limited to Products (or Components thereof) that SISAMEX would be manufacturing pursuant to a Board-approved Business Plan. (*See* SISAMEX and Quimmco's Smt. of Add'l Facts [268] ¶ 4; *see generally* SMX Ex. 199 [264-7].) Thus, section 3.4(a) of the Shareholders Agreement requires SISAMEX to make the capital expenditures necessary to manufacture, for example, products that Meritor "may" order

pursuant to section 4.4(b) of Supply Agreement A. (*See* Supply Agreement A § 4.4(b) ([SISAMEX and Sudisa] agree that they will install all required capacity and/or take all other required actions so that they will be able to supply to [Meritor] . . . all Products that may be ordered by [Meritor] within the then current forecast.").) If SISAMEX decides to expend capital to allow it to manufacture products contained in Meritor's forecasts and which Meritor may order, nothing in section 3.4(a) of the Shareholders Agreement appears to limit SISAMEX's ability to do so. And indeed, as discussed, section 3.5.2(e) of that agreement indicates that Board approval is *not* required for such expenditures.

Despite the language of the agreements, Meritor insists that though the SISAMEX Director General has the authority to request capital to insource the manufacturing of Meritor products, Board approval is required for such expenditures. In support of this claim, Meritor relies on Dowers's declaration and the testimony Larry Burgin, another Meritor employee. (*See, e.g.*, Dep. of Larry Burgin (hereinafter "Burgin Dep."), SMX Ex. 6 [232-6], 75:23–76:2 ("The director general had the ability to request, of the board, capital to manufacture anything that was on that list [of Meritor Products]. The board then had the obligation to approve or disapprove."); Dowers Decl. ¶ 14 ("Of course, the parties did intend that the joint venture would make some Components and products, but they also intended that decisions about which products or Components it made (as opposed to imported or assembled) would be subject to approval by the joint venture Board of Directors by way of the Business Plan and capital expenditure approvals. No one knew what the future would require, so the Shareholders wanted to be flexible as conditions changed subject to Board approval.").)

Dowers's declaration and Burgin's testimony, like that of Arnold, comes after the onset of litigation, is "one-sided and self-serving," *Davis*, 361 Mich. at 376, 105 N.W.2d at 31–32, and is not supported by the text of the agreements or any contemporaneous extrinsic evidence. Their position is also inconsistent with the parties' history of performance and Meritor's internal admissions, and is undermined by Meritor's failure to press this position at any previous stage of

this litigation. Apart from the actions that gave rise to this case, Meritor has not provided evidence of any previous instance in which Meritor or SISAMEX's Board of Directors blocked SISAMEX from insourcing a Meritor Product by withholding approval for a Business Plan or capital expenditures. This is particularly damaging for Meritor's argument because SISAMEX has produced evidence that Meritor officials, at various points, explicitly shared their concerns about SISAMEX's plans and ability to insource and their belief that such insourcing would be harmful to Meritor's business. In an email from Burgin to Arnold in June 2003, for example, Burgin warned that SISAMEX "could internally tool 145 [Components]," which would most likely leave Meritor with "excess capacity" because it would no longer be manufacturing the Components. (Email from Larry Burgin, 6/11/03, SMX Ex. 86 [233-36], at -30.)[7] Yet despite Meritor's concerns, by 2004, SISAMEX had insourced most of the Core Components of the 160 axle and had begun insourcing a Core Component of the 145 axle (SMX 56.1 Stmt ¶¶ 42, 45; Meritor 56.1 Resp. ¶¶ 42b, 45a–45b), and Meritor has not presented any evidence that it attempted to block such insourcing through the Board of Directors. SISAMEX has also demonstrated that by 2007, Meritor was distressed about SISAMEX's potential insourcing of Components of the 14_series of axles. (*See, e.g.*, Internal Meritor Presentation, SMX Ex. 41 [232-42], at -80 ("[Meritor] sells significant value to Sisamex in 145 carriers and some housings. They could chose [sic] to localize this and if they did so we would lose the sales.").) Rather than exercise its purported right to block such insourcing through SISAMEX's Board of Directors, however, Meritor proceeded to enter into the 2009 Interim Purchasing Commitments Agreement with SISAMEX, offering valuable consideration in exchange for SISAMEX's temporary agreement not to insource certain 14_ series Core Components. (SMX 56.1 ¶¶ 61, 63; Meritor 56.1 Resp. ¶¶ 61a, 63a.) Meritor's actions suggest, therefore, that prior to 2013 it believed it lacked contractual authority to block SISAMEX's decisions to insource Components

---

[7]     Meritor insists that the email also says that any capacity needed to insource the Components would need to be approved by the SISAMEX Board (Meritor 56.1 Resp. ¶ 41a), but the court has reviewed the email and has not found any such statement.

of Meritor Products.

Not only were Meritor's *actions* inconsistent with its purported understanding that it could block SISAMEX from insourcing Components of Meritor Products, but SISAMEX has also presented numerous examples of internal *statements* from Meritor employees expressing their understanding that SISAMEX had the right unilaterally to insource Components. For example, in an internal memorandum to its auditors, Meritor acknowledged that SISAMEX purchased 40% of the Components used in its manufacturing process from Meritor "but is not contractually obligated to do so." (Internal Memo from Greg Glaza, 1/28/11, SMX Ex. 79 [233-29], at -56.) Rather, Meritor conceded, SISAMEX's Director General "has control to make purchasing decisions" and has "discretion in selecting the suppliers." (*Id.*) The memorandum also explained that the Director General "has the oversight over the manufacturing process and general operations at Sisamex." (*Id.*)[8] In an internal email from April 2003, Meritor employee Joe Panella recognized that "[SISAMEX] ultimately decides what products will be localized in Mexico and the associated timing." (Email from Joe Panella, 4/15/03, SMX Ex. 84 [233-34], at -81.) In another internal email from March 2010, Meritor executive Joseph Plomin explained that Meritor was "selling direct to [SISAMEX] but they have the right to insource that supply at any time." (Email from Joseph Plomin, 3/6/10, SMX Ex. 117 [234-17], at -45.) And while Meritor was considering entering into the IPCA, Arnold—Meritor's lead negotiator of the joint venture agreements—admitted that Meritor did not have the power to block SISAMEX from making investments in its manufacturing capacity and thus believed its best option was to negotiate a change in the agreements to prevent such investment. (*See* Email from Bradley Arnold, SMX Ex. 147 [234-47], at -36 ("[SISAMEX] is required to meet any committed volumes in the supply

---

[8]    Meritor disputes the relevance of these admissions because they were made strictly for financial accounting purposes to determine whether Meritor was required to consolidate its interest in SISAMEX. (*See, e.g.*, Meritor 56.1 Resp. ¶ 37d.) The court does not understand how the purpose for which the statements were offered undermines their relevance. Indeed, the fact that the admissions were made to its auditors only hurts Meritor's position because it indicates that the statements were part of a "careful analysis" of the joint venture agreements. (*See id.* ¶ 37a.)

agreement for Components or for meeting supply to Mexican OEM[.]   Board approval is not required for such investment[.]   We cannot block per se[.]   We can influence[.]   Hence the rationale of negotiating an agreement change.").)

In sum, the language of the agreements, the parties' history of performance, and Meritor's admissions weigh heavily in SISAMEX's favor.   And even if this were not the case, Meritor would still be unable to create a genuine issue of material fact on the basis of language in the pre-contractual MOU or the *post hoc* testimony of its employees:  Meritor's failure to raise its "Board approval" position at any prior point in this litigation renders wholly implausible the assertion that the new interpretation represents the agreed intentions of the parties.  *See Detroit Greyhound Emp. Fed. Credit Union v. Aetna Life Ins. Co.*, 381 Mich. 683, 690, 167 N.W.2d 274, 278 (1969) (meaning of contract is "settled conclusively by mutually agreeable performance long before new and technical interpretive thoughts reared themselves for litigatory controversy").   Meritor now asserts that it has the authority to block SISAMEX's insourcing of Meritor Products, or Components thereof, by directing the Meritor-appointed members of SISAMEX's Board of Directors to withhold approval of SISAMEX's capital expenditures or of SISAMEX's Director General's proposed Business Plan.   But Meritor did not assert this position during the course of performance, in its formal notice to SISAMEX in 2013 indicating its opposition to SISAMEX's proposed insourcing, or in its pre-litigation dispute notice.   Nor did Meritor raise this argument in its complaint (Meritor Compl. ([1] in Case No. 14 C 5319)), in its answer to SISAMEX's complaint (Def. Meritor's Answer and Affirmative Defenses [101]), or in its motion-to-dismiss briefing (Meritor's Mem. in Supp. of Mot. to Dismiss [25]).   Meritor offers no plausible explanation for its failure to raise this argument until its response to SISAMEX's motion for summary judgment.   No reasonable fact finder could believe that the parties agreed Meritor could veto SISAMEX's insourcing decisions through its appointed members of the Board of Directors but that Meritor's representatives forgot to raise this point or intentionally withheld it

until litigation reached this late stage.[9]   Thus the court must grant summary judgment for SISAMEX on count I of SISAMEX's complaint and count I of Meritor's complaint.

**II.     SISAMEX's Obligation to Purchase from Meritor All Requirements for Core Components Unless SISAMEX's Shareholders Change SISAMEX's Business (Meritor's Count III)**

In its own complaint, Meritor asserts that sections 2.1 and 2.2 of Supply Agreement C obligate SISAMEX to purchase from Meritor all of its requirements for "Core Components" unless the Shareholders of SISAMEX (including Meritor) have mutually agreed to a change in SISAMEX's business.   (Meritor Compl. ¶ 87.)   Section 2.2(a) provides that SISAMEX must purchase from Meritor all of its requirements for Core Components that "[SISAMEX] does not manufacture itself."   (Supply Agreement C § 2.2.(a).)   In its prior opinion, the court concluded that the agreement was ambiguous with respect to whether the reference to Components that SISAMEX "does not manufacture itself" meant that there were Components that SISAMEX could *unilaterally decide* to manufacture itself.   As discussed in the above section, the court now concludes SISAMEX does have the contractual right to decide unilaterally to manufacture Components of Meritor Products, and thus section 2.2(a) of Supply Agreement C is best read to mean that SISAMEX must purchase from Meritor those Core Components that SISAMEX has not chosen to manufacture itself.

This interpretation of Supply Agreement C is supported by Meritor's own admissions. (*See* Arnold Dep. 132:7–14 ("Q. So basically what Supply Agreement C was intended to do was to give SISAMEX the ability to get a source of core Components to the extent that it didn't manufacture itself.   And if it elected not to or could not manufacture them, those core Components itself, it could get them from Meritor, or in a vendor that Meritor approved, right?

---

[9]     For the reasons just discussed—including the belatedness of Meritor's argument and its apparent conflict with the parties' past practice, Meritor's own admissions, and clear language in the Shareholders Agreement—the court rejects Meritor's arguments that the language in SISAMEX's bylaws and the language in Table 2.3 of Supply Agreement A create a genuine issue of material fact regarding SISAMEX's ability to insource Meritor Products and Components unilaterally.   The court discusses these arguments in greater detail, however, in the sections below.

A. Correct."); *id.* at 91:14–92:16 ("Generally, SISAMEX could make or buy the Components that go into assemblies that are delivered to Meritor for shipment to the OEMs."); Internal Meritor Presentation, 8/6/13, SMX Ex. 65 [233-15], at -38 (explaining that under the original agreement SISAMEX has the option to purchase the 14_ series Core Components or manufacture them itself); Meritor Presentation "Supply Agreements with Quimmco," 1/16/13, SMX Ex. 171 [232-21], at -21 (stating that under Supply Agreement C, "Sisamex not obligated to buy <u>any</u> % of requirements for [Mexican] market from [Meritor]."). Evidently to minimize the significance of these admissions, Meritor now adopts the new position that SISAMEX may manufacture Core Components itself, but only pursuant to the SISAMEX Board's approval of a Business Plan and capital expenditures, or if Meritor provides express approval under section 2.4 of the agreement. (*See, e.g.*, Meritor 56.1 Resp. ¶ 30b.) This interpretation is not supported by the language of the agreement or the parties' history of performance, however, and the court rejects this novel argument for the same reasons it rejected Meritor's new argument above.

Meritor argues that because it was Meritor who added the "does not manufacture itself" language to Supply Agreement C, it would not make sense to interpret the phrase in a manner adverse to Meritor. The court is not convinced, however, that just because Meritor inserted the phrase, it should be interpreted the way Meritor prefers. Meritor added "does not manufacture itself" as part of a larger edit clarifying that Meritor would be the exclusive supplier of Components SISAMEX purchases—that is, to prohibit SISAMEX from purchasing from third parties. As Meritor explains, in the drafting process, it removed SISAMEX's language that would allow SISAMEX to purchase from Meritor on a non-exclusive basis. (Meritor Resp. at 13.) It would be entirely reasonable for Meritor to insist on exclusivity in purchasing while also proposing that its joint venture (SISAMEX) could manufacture those Components it did not wish to purchase from Meritor. That reading of the agreement is consistent with the extrinsic evidence in the record, regardless of which party inserted the language at issue.

Meritor also relies on Table 2.3 from Supply Agreement A as support for its reading of

Supply Agreement C. The court's prior opinion observed that Table 2.3 to Supply Agreement A discusses which types of brakes constitute "Meritor Products" and identifies air and hydraulic brakes as Meritor Products that are also "considered Core Components under SUPPLY AGREEMENT C (COMPONENTS FOR [Meritor] SALE TO [SISAMEX]), and are not to be manufactured by [SISAMEX] until otherwise agreed by [Meritor]." (Supply Agreement A at -76.) The court explained that this provision supported the position SISAMEX took during the motion-to-dismiss briefing—namely, that under the agreements, Components can also be products, such that SISAMEX's right to manufacture Meritor products would include the right to manufacture Components. MTD Opinion, 2015 WL 390790, at *11. But the court also noted that the language in Table 2.3 might undermine SISAMEX's contention that it can decide to insource Core Components at any time because it suggests that Core Components under Supply Agreement C are not to be manufactured by SISAMEX without Meritor's agreement. *Id.* SISAMEX has now explained, and Meritor does not dispute, that air and hydraulic brakes were originally excluded from the scope of the joint venture's supply agreements because Meritor had already committed to manufacturing those suspensions through other joint ventures. (SMX 56.1 ¶ 26.) SISAMEX insists that Table 2.3 confirms SISAMEX's interpretation; it sets out an exception to the general rule that SISAMEX may decide whether it will manufacture Core Components of Meritor Products. (*Id.*)

Meritor's response to this argument relies on Larry Dowers' declaration. In that declaration, Dowers explains that at the time the parties were drafting the agreements, Meritor's "brakes division" was concerned that the joint venture might begin making air and hydraulic brakes because they were listed both as Products under Supply Agreement A and as Core Components under Supply Agreement C. (Dowers Decl. ¶ 18.) Dowers says that, to address the concern of the brakes division, he drafted the language requiring SISAMEX to obtain Meritor's agreement in order to manufacture air and hydraulic brakes. (*Id.* ¶ 19.) That is, Dowers contends that the SISAMEX Board of Directors could have blocked SISAMEX's

insourcing of these brakes by withholding approval of the Business Plan, but he added an *additional* requirement so that even if it obtained Board approval, SISAMEX would be prohibited from manufacturing the brakes without also obtaining Meritor's agreement. (*Id.*) One might wonder why such additional protection against insourcing brakes was required. To address this question, Meritor and Dowers point to an email Dowers sent to the brakes division, in response to the division's concern about SISAMEX's potential manufacturing of brakes. In the email, Dowers explains that Board approval is required for capital investments over $1 million, which would provide a way for Meritor to block SISAMEX's manufacture of the brakes. (*Id.* ¶ 20.) At oral argument, Meritor's counsel explained that Dowers and the Meritor brakes division were concerned that SISAMEX might be able to develop capacity to manufacture brakes for less than $1 million, and so Dowers added the language in Table 2.3 to provide the brakes division with additional protection in case the Board of Directors could not block SISAMEX from "tooling up" to manufacture the brakes. (Tr. Of Proceedings, Oral Argument, 8/14/16, at 88.)

Respectfully, that position is simply not plausible. If, as Dowers and Meritor contend, Meritor could have blocked SISAMEX from manufacturing the brakes by withholding Board approval of a Business Plan or capital expenditures, then the language in Table 2.3 would be unnecessary. And the explanation for this "additional protection" that Dowers and Meritor offer is contrary to the plain language of the Shareholders Agreement. Although they contend that Board approval was required for capital investments over $1 million, the Shareholders Agreement is clear that the limit on capital investments without Board approval applies only for "Company Products"—that is, SISAMEX's own products that it manufactures and sells from time to time. (*See* Shareholders Agreement §§ 3.4(b), 1.1.)[10] When it comes to capital expenditures necessary for the manufacture of Meritor Products, Board approval is not required under the Agreement. (*Id.* § 3.5.2(e)(vi).) Meritor's reading of Supply Agreement C is thus just as

_____

[10]     As SISAMEX explains, the $1 million cap to which Dowers refers in his email was eventually raised to $5 million in the final agreement. (*See* Shareholders Agreement § 1.1., at -6.)

implausible as its reading of Supply Agreement A, and no reasonable trier of fact could credit its position.

### III. Meritor's Obligation to Provide Technical Assistance to SISAMEX for the Manufacture of Meritor Products (SISAMEX's Count II)

Section 2.2(e) of the Shareholders Agreement requires Meritor "to provide [SISAMEX] with technical assistance for the manufacture of the Meritor Products as provided in the Technical Assistance and Management Agreement." (Shareholders Agreement § 2.2(e).) In December 2002, the parties executed the First Amendment to the Shareholders Agreement, which provided that all references in the Shareholders Agreement to "Technical Assistance and Management Agreement" shall be changed to "Management Services Agreement." (First Amendment to Shareholders Agreement, SMX Ex. 44 [232-45], ¶¶ 16–17.) The Management Services Agreement that the parties then executed in January 2003 does not obligate Meritor to provide technical assistance. (Management Services Agreement, SMX Ex. 45 [232-46].) Meritor argues, therefore, that it has no obligation to provide technical assistance to SISAMEX. (Meritor Resp. at 14.)

SISAMEX insists that the parties determined that a separate technical assistance agreement was unnecessary because Meritor would be compensated for that assistance through commissions on sales and not from any additional fees that SISAMEX would pay Meritor for such assistance. (SISAMEX 56.1 Resp. ¶ 24.) That this was in fact the parties' understanding is confirmed by a December 2002 email from Arnold to other Meritor employees. (*See* Email from Bradley Arnold, 12/8/02, SMX Ex. 43 [232-44], at -81 ("I do not believe we will be billing routine support to the JV[.] We are getting major mgt fee in another manner that covers our [engineering support] expenses as well as receiving a major carve out of sales for our Mexican company[.]").) And in response to SISAMEX's evidence that Meritor provided technical assistance at no additional fee for the first ten years of the joint venture, Meritor acknowledges that it "has repeatedly provided routine product design engineering support to the

joint venture in order to make sure that the joint venture succeeds in supporting Meritor's business in Mexico."  (Meritor 56.1 Resp. ¶ 23.)  Meritor now asserts, however, that if a Product or Component that SISAMEX intends to manufacture has not been included in a Board-approved SISAMEX Business Plan, Meritor needs not, and does not, provide technical assistance for that product or component.  (Meritor Resp. at 15.)  In addition, Meritor draws a distinction between "product engineering"—that is, the product design drawings and necessary Bill of Materials—and "manufacturing process engineering," and insists that Meritor is required only to provide the former, but not the latter.  (*Id.*; *see also* Burgin Dep. 119:9–120:18 (Meritor provided "[p]roduct engineering only" to SISAMEX).)

As SISAMEX correctly notes, Meritor has never before distinguished between product engineering and manufacturing process engineering, either in this litigation or in its history of dealings with SISAMEX and Quimmco.  Nor has Meritor previously asserted that it will only provide technical assistance with respect to products or Components that were included in a Board-approved Business Plan.  The only support Meritor provides for this new position is Burgin's deposition testimony and Dowers' declaration.  (*See* Dowers Decl. ¶¶ 31–32.)  As explained earlier, such self-serving *post hoc* testimony is insufficient to defeat summary judgment, especially when it finds no support in the language of the agreements or the history of the parties' performance and was not raised in prior stages of this litigation.  The court concludes that pursuant to section 2.2(e) of the Shareholders Agreement, as clarified by the parties' history of performance for the first ten years after the Agreement, Meritor is obligated to provide necessary technical assistance to SISAMEX for the manufacture of Meritor Products.

IV.    **Whether SISAMEX or Meritor has Breached the Parties' Agreements (SISAMEX'S Count III and Meritor's Counts II and IV)**

The court has determined that the parties' agreements grant SISAMEX the right to decide unilaterally to manufacture Meritor Products, and Components thereof, for sale by Meritor to OEMs in Mexico, and that Meritor must provide technical engineering assistance for

such manufacturing. Because the parties do not dispute that Meritor has refused to purchase certain Meritor Products that SISAMEX intends to insource and do not dispute that Meritor has refused to provide technical assistance for the manufacturing of such Products, the court concludes that Meritor is in breach of the parties' agreements.

The court ruled in its prior opinion that Meritor may not unreasonably withhold its approval of SISAMEX's sourcing of production materials from third-party vendors. MTD Opinion, 2015 WL 390790, at *13; (*see also* (Supply Agreement A § 8.1; Supply Agreement B § 8.1.) SISAMEX asserts that Meritor has breached this obligation as well. It is undisputed that Meritor withheld approval of SISAMEX's sourcing certain production materials from third-party vendors Ramkrishna Forgings Limited ("Ramkrishna") and Zhuzhou Gear Co. ("Zhuzhou"). (SMX 56.1 Stmt. ¶¶ 72, 74; Meritor 56.1 Resp. ¶¶ 72, 74b.) Meritor argues, however, that it had concerns about the quality and reliability of those vendors and thus had a reasonable basis to withhold approval of SISAMEX's sourcing from them. (Meritor Resp. at 19–20, 25.) SISAMEX responds that Meritor never raised concerns about the vendors' quality and reliability at the time that it withheld its approval of them. Meritor's real concern with SISAMEX's use of the third-party vendors, it argues, was the resulting loss of revenue for Meritor. (SISAMEX and Quimmco's Reply Mem. in Supp. of Mot. for Partial Summ. J. (hereinafter "SISAMEX Reply") [263] at 24–25.) Meritor, however, has produced some evidence, including contemporaneous documents, reflecting its concerns about the reliability of Ramrkishna and Zhuzhou as vendors (*see* Meritor Resp. at 19–20), and the court ultimately believes that the determination of whether Meritor's withholding or approval was "reasonable" is simply too fact-bound to be decided on summary judgment.

Whether or not Meritor's withholding of approval for third-party vendors constitutes a breach of the parties' agreements, however, the court agrees with SISAMEX that Meritor's failure to provide technical assistance and failure to purchase Meritor Products that SISAMEX has opted to manufacture does constitute a breach of the agreements. Meritor insists that it

cannot be in breach of the agreements because it simply followed the procedures outlined in those agreements. It points to SISAMEX's bylaws, which provide that "[a]ll business of the Company shall be conducted according to a Business Plan of the Company developed by the Director General and approved by the Board of Directors of the Company. The Company shall only manufacture, sell and commercialize those products and Components provided for in the Business Plan." (Second Amendment to Shareholders Agreement, Bylaws, Meritor Ex. 21 [250-21], Art. 32, at -66.) The Shareholders Agreement similarly states that "all business of the Company will be conducted according to a Business Plan of the Company." (Shareholders Agreement § 2.3(a).) As Meritor notes, although that Plan is developed by the Director General, it must be "approved by the Board of Directors of the Company." (*Id.*; *see also id.* § 3.5.2.(e) (Business Plan "may not be approved by . . . the Director General . . .").) The Shareholders Agreement also allows any Director to "elect at any time that any matter which would otherwise require approval of the Board of Directors . . . shall instead be submitted for approval by the Shareholders . . . ." (*Id.* § 3.5.2.(f).)

Meritor emphasizes that the Board of Directors did not approve the 2014 Business Plan proposed by the Director General, and instead elected to have the Plan submitted to the Shareholders (which was not done). SISAMEX's Bylaws and the Shareholder Agreement prohibit SISAMEX from engaging in business (like the insourcing at issue) that is not listed in an approved Business Plan, Meritor argues. Thus, Meritor insists, it is SISAMEX and not Meritor that is in breach of the Agreements. (*See, e.g.*, Meritor Resp. at 2.) SISAMEX responds that it would be a breach of a Director's fiduciary duty to withhold approval of a Business Plan, even though that Plan serves SISAMEX's best interests, merely to further the interests of one of the Shareholders (Meritor). (SISAMEX Reply at 21.) The court need not decide whether a Director's withholding of support under these circumstances would constitute a breach of the Director's fiduciary duty. Rather, the court rejects Meritor's argument because it proves too much. If Meritor's position were correct, it would follow that Meritor could shut down the

operation of SISAMEX's business *for any reason* simply by refusing to approve the Business Plan. The Bylaws and Shareholders Agreement state that *all business* must be conducted according to an approved Business Plan. But the Shareholders Agreement contemplates that at least some matters, such as the commitment of capital expenditures for the manufacture of Meritor Products (Shareholders Agreement § 3.5.2(e)(vi)), will be committed to the sole discretion of the Director General. Meritor's argument suggests that SISAMEX Directors could override such discretion by withholding approval of the annual Business Plan. Meritor has produced no evidence that the parties intended to give the Board of Directors such broad authority, and no reasonable jury could conclude that the Meritor-appointed members of the Board of Directors possess the power to shut down SISAMEX's operations on an annual basis for any reason.

## CONCLUSION

For the reasons discussed above, the court grants SISAMEX's motion for partial summary judgment [228] ([191] in Case No. 14 C 5319) on all counts except for the issue of whether Meritor breached the parties' agreements by unreasonably withholding approval of third-party vendors. As the court concludes a trial will not likely be necessary, the motion to strike the trial testimony of Meritor's expert [223] ([186] in Case No. 14 C 5319) is stricken as moot.

ENTER:

Dated: February 7, 2017

_____
REBECCA R. PALLMEYER
United States District Judge